RANDY S. GROSSMAN
United States Attorney
DAVID CHU (CA Bar No. 242046)
VALERIE H. CHU (CA Bar No. 241709)
MARK W. PLETCHER (CO Bar No. 034615)
MICHELLE L. WASSERMAN (CA Bar No. 254686)
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101
Telephone: (619) 546-9714

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No.  17-CR-0623-JLS |
|---|---|
| Plaintiff, | **RESPONSE BY THE UNITED STATES IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS FOR PROSECUTOR MISCONDUCT** |
| v. | |
| DAVID NEWLAND, ET AL., | |
| Defendants. | |

The Defendants have moved this Court to dismiss the indictment with prejudice. Dismissal is disproportionate to the issues identified, and remedies far short of dismissal will ensure that this trial is fair.   The Ninth Circuit has made clear that courts can exercise their supervisory power to dismiss only if there is "flagrant misbehavior" that causes "substantial prejudice" to the defense. *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993).  Conduct that is "negligent, or even grossly negligent" is not sufficient to meet this standard. *Id*. at 1255.  And even when these requirements are met, a court must approach "the remedy with some caution and with a view toward balancing the interests involved." *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020).  The Court must also "have concluded that there is no lesser remedial action available to it." *Id*.  Remedies should be "tailored" to the injury. *United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010).  In short, dismissal of an otherwise valid

criminal indictment is a "drastic" and "disfavored" remedy. *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988).[1] None of the Defendants' many allegations of misconduct – either alone or in combination – support dismissal of the Indictment. This Court should deny the motion and allow the case to be submitted to the jury.

## I.   THE ALLEGED FALSE STATEMENTS DO NOT WARRANT DISMISSAL[2]

### A.   Factual Background

Prior to the start of trial, the United States attempted to locate and contact approximately five women previously hired as prostitutes by Leonard Francis to see if they could be persuaded to come to the United States to testify. April 26, 2022 AM Tr. 24, 76. In early March, after trial had begun, agents successfully contacted one of the former prostitutes, known as "Ynah," by telephone in the Philippines. *Id.* at 34. During an initial call, Ynah told agents that her husband did not want her to come to the United States to testify. April 26, 2022 PM Tr. 118. She also offered, unprompted, that she falsely told Leonard Francis that she had sex with someone, in order to get paid, but she refused to tell the agents who that person was. *Id*. Because the reception was bad on the initial call, agents provided a WhatsApp number to facilitate another call. *Id.* at 114. Ynah then responded by text that she was hungover, so agents offered to talk on another day. *Id*. at 115. She also sent text messages, again unprompted,

---

[1]   In the post-trial context, "the appropriate remedy" for a *Brady* or *Giglio* violations "will usually be a new trial," not dismissal. *United States v. Kohring*, 637 F.3d 895, 913 (9th Cir. 2011).

[2]   On May 3, 2022, the Defendants filed a motion to dismiss, alleging the United States (1) failed to comply with *Brady v. Maryland*, 373 U.S. 83 (1963), (2) failed to "correct a false narrative, (3) offered improper payments to witnesses, and (4) made false statements to the Court. Doc. 873. The United States responded to the first three arguments but reserved briefing on the alleged false statements to correspond with the Defendants' "omnibus" misconduct motion. Doc. 896. The first half of this response addresses the alleged false statements and the second half addresses the allegations from the omnibus motion.

1    stating "[t]hat particular person, he doesn't even look like that he wants me to go with

2    him but Leonard really pushed for it, so I still went with him in his room but nothing

3    happened, I even slept on the couch lol."  Doc. 846.

4         Agent Oscar Cunha spoke with Ynah on the phone a few days later, and he

5    recalled that while Ynah was "cordial" she "made it clear that she did not want to

6    participate, she did not want to come to San Diego, she did not want to talk to us."

7    April 27, 2022 PM Tr. 120.  Agent Trey De La Pena got the same impression. *Id*. at

8    50 ("[S]he had no interest in testifying, and my recollection is that she didn't want to

9    talk anymore.").  In addition, the only purpose of the initial contact with Ynah was to

10   confirm her identity and see if she would be willing to travel to the United States to

11   testify – not to conduct a substantive interview over the phone.  April 26, 2022 PM Tr.

12   117; April 27, 2022 PM Tr. 113.  When Ynah made it clear that "she didn't want to

13   come to the United States," agents did not attempt to obtain any more information

14   from her over the phone.  April 26, 2022 PM Tr. at 122.

15        After the contact with Ynah, agents approached AUSA Mark Pletcher with

16   questions about the correct format for preparing a report of their interaction, since it

17   would include both "negative reporting" that would not normally require a report, as

18   well as the unprompted, substantive text messages.  April 26, 2022 PM Tr. 128; April

19   27, 2022 PM Tr. 121; April 28, 2022 AM Tr. 11.  Although the agent showed AUSA

20   Pletcher the WhatsApp messages on his phone, by scrolling down on the screen,

21   AUSA Pletcher did not read the substance of the messages, and responded "let me

22   think about this" in response to the question of how to best prepare a report.  April 28,

23   2022 AM Tr. 10–11; April 27, 2022 PM Tr. 121.  As the trial continued, agents

24   attempted to raise the issue several more times with AUSA Pletcher, but he responded

25   that they should "circle back" about the proper format, because he did not have time

26   to address the issue given the demands of trial.  April 28, 2022 AM Tr. 10–11.  These

27   interactions were "fleeting," with some lasting just a few seconds, and they always

28   focused on the correct form of the report, not the substance of the communications

1  with Ynah.  *Id.* at 46, 50.  In fact, throughout this time, AUSA Pletcher had still "never

2  seen the content of the contact on the telephone call," nor had he "seen the entirety of

3  the text message string," or been "able to talk substantively" with the agents about its

4  content.   *Id.* at 67. AUSA Pletcher also never raised the issue with any other

5  prosecutors on the team, but he was not aware "whether the agents talked to [the other

6  prosecutors] independently" after they spoke with him.  *Id.* at 59.

7          On April 20, 2022, Defendant Lausman's attorney, Bob Boyce, raised an

8  objection to the upcoming testimony of a witness who observed his client leaving a

9  party in Manila with a prostitute.  April 20, 2022 Tr. 82. After some back and forth

10  about what specific testimony Mr. Boyce was trying to exclude, the Court interjected:

11          Let me stop you for a minute.  I have no idea who is going to testify, but

12          I remember very well the Motion in Limine to let people come in here

13          under pseudonyms which was denied.  Are these people [the prostitutes]

14          coming to testify?  If you're not going to tell the Court, it's really, really

15          hard to get these rulings accurate, and it's really, really hard to defend

16          this case, and it's really, really hard to know where we're going, folks so

17          take a moment and confer, if you need to.  But there's a point at which

18          people need to put – especially the government – I'm not asking the

19          defense, but the government needs to tell us who's going to testify, folks.

20  *Id*. at 89.  In response, AUSA Valerie Chu – who was at the podium after questioning

21  the previous witness – stated, "Your Honor, at this point, because the Court denied that

22  motion, we don't have anyone willing to come and testify in their true names."  *Id*.

23  The Court responded that it did not "accept the fact that because the Court said these

24  women could not come in here under pseudonyms that that's the basis for them not

25  showing up."  *Id*.  The Court continued, "So you're telling me they want to remain

26  anonymous, but if that's what you want to tell the Court, that's fine.  It doesn't sound

27  as though that's the basis, but that's fine. So we're not going to hear from them." April

28  20, 2022 Tr. at 89.  AUSA Chu responded, "That is correct, Your Honor."  *Id*.

1         Immediately following this exchange, Mr. Boyce informed the Court that he had

2    never received any report about the agents' interview with Ynah. *Id.* at 90. When the

3    Court asked whether any such report existed, AUSA Pletcher responded:

4               I want to follow up with the agents because we were trying to contact a

5               number of the women during that time and were looking for phone

6               numbers on social media and things like that, contemporaneous with the

7               motions, so I want to go back with the agents and just make sure that –

8               whether there was any follow-up to that April report with respect to her .

9               . . .

10   *Id.* at 92. When the Court asked if the same issue was "going to come up with other

11   individuals where there might be additional reports relative to statements people have

12   made," AUSA Pletcher responded "I'm not sure, Your Honor." *Id*. He asked for a

13   "chance to go back and follow up with that particular issue." *Id*.

14        After court, the prosecution team returned to the office, checked with the agents,

15   and confirmed that a report documenting the contact with Ynah had never been created

16   or produced. April 28, 2022 AM Tr. 69. AUSA Pletcher recognized that he "had

17   dropped the ball." *Id*. at 73. He talked to the other members of the team, including

18   AUSA Wasserman, and explained that he "meant to get it done with the agent, and he

19   just had basically been overtaken by events," and the report had inadvertently "fallen

20   through the cracks." April 28, 2022 PM Tr. 17; April 28, 2022 AM Tr. 73. That night,

21   the agents and prosecution team prepared a report of the contact with Ynah and

22   produced it to the defense. April 28, 2022 AM Tr. 68.

23        At a hearing the next morning, AUSA Wasserman relayed this information to

24   the Court, explaining that "the writing of that report simply fell through the cracks.

25   That was inadvertent on our part." April 21, 2022 Tr. 5. After a lengthy discussion

26   about whether an evidentiary hearing was needed, AUSA Wasserman attempted to

27   make a legal argument as to why the information provided by Ynah did not constitute

28   *Brady* material. *Id*. at 16. She explained that defense counsel already had the

1    information – in much more detail – based on an interview with a defense investigator,

2    and the information Ynah provided the government was so vague that it was not

3    actually "exculpatory." *Id*. at 16.  She noted that Ynah "didn't give a name.  She didn't

4    give a date.  She didn't give a party.  She said she didn't recognize individuals as

5    members of the United States Navy.  She gave extremely vague statements that wasn't

6    tied to time and place." *Id*.  When the Court responded, "This is your lead investigator

7    who gets hold of somebody who's a critical witness," AUSA Wasserman responded

8    "And she didn't want to talk to them . . . .  She just simply did not give federal agents

9    that much information." *Id*. at 16.  Ultimately, after hearing additional argument from

10   both sides, the Court ordered an evidentiary hearing, and heard testimony from agents

11   and prosecutors over the course of three days.

12          **B.      The Alleged False Statements Do Not Warrant Dismissal**

13          The Defendants first argue that AUSA Pletcher "falsely informed" this Court,

14   on April 20, 2022, that he needed to "check with agents" about whether there had been

15   "follow up" to the initial reporting about Ynah.  Doc. 873 at 8.  The Defendants argue

16   this was inaccurate, because "he well knew" that agents had in fact spoken with Ynah

17   several times and had been asking him about writing a report for weeks.  *Id*.  But

18   AUSA Pletcher's comment came in response to a direct question from the Court as to

19   whether any *report* existed documenting these contacts.  April 20, 2022 Tr. 93 ("Is

20   there such a thing?").  He knew that agents had spoken with Ynah and approached him

21   about writing a report, but when this issue first resurfaced at the April 20 hearing, he

22   was unsure "in the intervening time period since it was last on [his] radar, whether

23   there was any follow-up" or "whether this report had been produced."  April 28, 2022

24   AM Tr. 68–69.  That is, he did not know "whether agent Cunha or agent Kelley or any

25   of the other prosecutors had picked the issue up in the interim."  *Id*.  It was certainly

26   not misconduct for him to ask the Court for more time to "go back and check," and

27   then immediately turn over the missing report after confirming his error.

28

The Defendants next argue that it was inaccurate for AUSA Pletcher to respond to the Court's question if "this issue is going to come up with other individuals where there might be additional reports," with "I'm not sure, Your Honor.  Certainly the names of various of these women are associated with various of the defendants."  Doc. 873 at 8.  The Defendants contend this was actually false, because AUSA Pletcher "knew that no woman had agreed to testify that she engaged in an act of prostitution with any of these defendants." *Id*.  But the Court did not ask whether any of the women had agreed to *testify*; the Court asked whether there were any "additional reports" that might be missing from discovery.  April 20, 2022 Tr. 93.  AUSA Pletcher's response of "I'm not sure" and "[g]ive us a chance to go back and follow up with that particular issue" was entirely accurate.

In addition to these statements from AUSA Pletcher, Defendants also focus their motion on several statements made by AUSA Wasserman at the April 21, 2022 hearing the next day.  First, they argue that it was a false statement for AUSA Wasserman to tell the Court, "[W]e acknowledge that basically that writing of that report simply fell through the cracks.  That was inadvertent on our part."  Doc. 873 at 10.  But that statement is accurate.  As this Court heard at the evidentiary hearing, the agents had a question about the specific format that the report of their interactions with Ynah should take.  April 26, 2022 PM Tr. 128; April 27, 2022 PM Tr. 121; April 28, 2022 AM Tr. 11.  While they raised the issue with AUSA Pletcher several times during trial, he repeatedly told them to "circle back" on the issue, because he was busy, but he ultimately "dropped the ball" and never made a final decision.  April 28, 2022 AM Tr. 73.  AUSA Pletcher acknowledged his mistake and explained what happened to the other members of the prosecution team when they returned from court.  *Id*. at 73 ("I told [AUSA Wasserman] . . . that was not timely executed, that I dropped the ball, and that that was inadvertent on my part and derivatively on the part of our entire prosecution team.").  It was not misconduct for AUSA Wasserman to accurately relay this information to the Court the next morning.

1     The Defendants next argue that it was "misleading" for AUSA Wasserman to

2  suggest that Ynah was "unwilling to talk further with agents" after their initial contact.

3  Doc. 873 at 10.  But this was exactly how the agents recounted their interactions with

4  Ynah.  April 27, 2022 PM Tr. 120 (Agent Cunha: She "made it clear that she did not

5  want to participate, she did not want to come to San Diego, she did not want to talk to

6  us"); *id*. at 50 (Agent De La Pena: "[S]he had no interest in testifying, and my

7  recollection is that she didn't want to talk anymore").  That is how AUSA Wasserman

8  understood the interaction as well.  April 28, 2022 PM Tr. 7 ("She wasn't willing to

9  talk to them anymore, and wasn't willing to come here."); *id*. at 8 ("[M]y

10  understanding was she wasn't really willing to talk to the agents, that she had really

11  shut that down.").  Although the Defendants point to one text message from Ynah, at

12  the conclusion of her interaction with agents, in which she offers "if there are other

13  questions you want to ask, I would answer you what I know," Doc. 873 at 12, when

14  viewed in context, that does not show that she actually wanted to continue talking with

15  the agents.  Based on the entire interaction, including two phone calls and multiple text

16  messages, the agents understood that she did not want to cooperate, did not want to

17  travel to the United States, and did not want anything more to do with them.  It was

18  not "misleading" for AUSA Wasserman to relay that understanding to the Court.

19     Defendants next argue that it was "misleading" for AUSA Wasserman to argue

20  that Ynah's statements were too vague to link her to the case or identify which

21  defendant she was referring to.  Doc. 873 at 11.  But AUSA Wasserman's statement,

22  "[S]he didn't give a name.  She didn't give a date.  She didn't give a party," came in

23  the context of a legal argument about whether the statements qualified as *Brady*

24  material at the time they were first received back in March.  April 28, 2022 PM Tr. 9

25  ("It's a little hard to divorce what I now know from what I knew back then.").  She

26  was not representing that the United States had *never* put two and two together and

27  figured out who Ynah was referring to by the time AUSA Wasserman made the

28  statement on April 21, 2022.  AUSA Wasserman was just describing the vague nature

1    of Ynah's comments – when comparing them to the "extent of the information that the

2    defense" had at the time of the contact in March – as part of her broader *Brady*

3    argument.  April 21, 2022 Tr. 16.  This was ultimately not a successful argument, but

4    it was not misconduct.

5              Finally, the Defendants point to a brief exchange at the April 20 hearing, when

6    the Court recounted that it had denied a motion before trial to allow prostitutes to

7    testify under a pseudonym and inquired whether any of those witnesses would be

8    testifying.  April 20, 2022 Tr. 89.  AUSA Valerie Chu responded, "Your honor, at this

9    point, because the Court denied that motion, we don't have anyone willing to come

10   and testify in their true name."  *Id.* at 89.  This was not accurate.  The United States

11   had explored offering the possibility of anonymity when it made contact with prostitute

12   witnesses as one option for incentivizing the witnesses to testify.  But from the outset,

13   there was a "low likelihood" that any of the witnesses would agree to testify, and there

14   were many reasons why each refused to travel to the United States.  April 28, 2022

15   AM Tr. 33; April 26, 2022 PM Tr. 30. None of the witnesses refused to testify

16   "because" they would not be allowed to testify under a pseudonym, and the United

17   States should not have made this blanket assertion in response to the Court's question.[3]

18             The United States acknowledges that its response to the Court's question was

19   inaccurate – as the Court itself immediately recognized.  *Id.* at 89 ("I don't really accept

20   the fact that because the Court said these women could not come in here under

21   pseudonyms that that's the basis for them not showing up.  I truly don't.").  But this

22   isolated statement during one exchange in this lengthy trial simply does not rise to the

23   level of "flagrant misbehavior" that would support dismissal of the indictment.

24   *Kearns*, 5 F.3d at 1253.

25

26   _____

     [3]    When the Court expressed skepticism, AUSA Chu did not challenge the Court's

27   view but merely confirmed that no prostitute witnesses would be testifying.  AUSA
     Chu regrets the misstatement and appreciates the opportunity to apologize to the Court
28   and acknowledge the mistake in this pleading.

1    In addition, the Defendants have also failed to show that they suffered
2  "substantial prejudice" from any of the alleged misstatements by the prosecutors. *Id*.
3  That showing requires the misstatement to have "had at least some impact on the
4  verdict and thus redounded to the defendant's prejudice." *United States v. Lopez*, 4
5  F.3d 1455, 1464 (9th Cir. 1993) (cleaned up).  Here, the entire exchange with the Court
6  took place outside the presence of the jury.  April 20, 2022 Tr. 83 ("Let's be sure right
7  now, the people who are going to judge believability have left.").  When the jury
8  returned, a week later, they never heard any testimony about the late-discovered report,
9  nor did they hear anything about *why* prostitution witnesses were not called to testify.
10  In short, none of the prosecutors' exchanges with the Court on April 20 and 21 had
11  any actual impact on the disputed issues at trial.  There was therefore no "substantial
12  prejudice" that would support the "drastic" exercise of this Court's supervisory powers
13  to dismiss the indictment.  *See United States v. Ross*, 372 F.3d 1097, 1111 (9th Cir.
14  2004) ("We find no prejudice where the governmental misconduct is so distant and
15  vague in its relationship" to the specific defense at trial).

16  **II.   NONE OF THE ISSUES RAISED IN THE OMNIBUS MOTION**
17  **WARRANT DISMISSAL**

18    None of the issues raised by the Defendants in the omnibus motion to dismiss,
19  Doc. 902 – either individually or collectively – meet the high standard for the Court to
20  exercise its supervisory power to dismiss an indictment for prosecutorial misconduct.
21  The issues have either already been addressed by the Court (as the Defendants
22  concede, Doc. 902 at 3) or are not misconduct at all.  The United States addresses each
23  issue in turn.

24    **A.   The Court Has Already Ruled on Sanchez and Possible Child**
25    **Pornography**

26    The issue of Jose Sanchez and possible child pornography on his computer has
27  been previously and extensively briefed before the Court.  Docs. 851, 871, 884, 893.
28  Ultimately, the Court ruled:

1
2
3
4
5
6

> As a sanction for the untimely disclosure and Defendants' inability to retain an expert to examine the file, the Court is prepared to instruct the jurors that they may assume that the images are in fact child pornography. This places the Defendants in the same position, or perhaps even a better position, as they would have been had they received full information before trial.

7   May 11, 2022 PM Tr. 111:3-9. The Court has therefore fully addressed the

8   issue.[4]

9       The Defendants take issue with the fact that the United States offered evidence

10  that the provision in Sanchez's plea agreement related to classified information and

11  not child pornography, characterizing that action as "doubl[ing] down." Doc. 902 at

12  4. Yet that evidence was a signed declaration from Sanchez's lawyer stating that the

13  language at issue was requested by him specifically to address classified information,

14  not child pornography. Doc. 893-1 at 1–2. This is not prosecutorial misconduct; it is

15  evidence of why Sanchez's lawyer requested the language at issue in the plea

16  agreement. In any event, the Court was aware of this declaration when it addressed

17  the issue on May 11, 2022.

18   **B.    The Court Has Already Ruled on GDMA's Business Record**
19          **Certification**

20       The United States fully admits that it had to correct GDMA's business records

21  certification signed by Leonard Francis. Doc. 902 at 5. As explained when it filed the

22  corrected certification, the United States mistakenly appended a draft of its entire

23  exhibit list to the certification. Doc. 622 at 9. To correct the error, the United States

24
25
26
27
28

---

[4]    The Court's ruling was tentative, but the United States is no longer calling Sanchez, thus obviating any prejudice of the late disclosure of discovery regarding impeachment. To the extent the Defendants claim that evidence that Sanchez may have possessed child pornography is somehow relevant and exculpatory even without Sanchez's testimony, their claims are ill-founded. That Sanchez may have possessed these images is irrelevant to a prosecution case without Sanchez and it fails to support any identified viable defense.

1  appended the correct list of documents and had Francis re-review the entire set to

2  ensure accuracy.  *Id.* at 10.  And the Court ruled that the corrected certification met the

3  requirements of Federal Rule of Evidence 902(11) and 18 U.S.C. § 3505.  Doc. 633 at

4  31:12–22.  Thus, the Defendants' argument rehashes evidentiary issues this Court has

5  already addressed.  These are standard trial disputes, not actionable misconduct.

6       **C.     There Was No "Doctoring" of Emails**

7       There is no evidence that any of the emails that were admitted at trial were

8  doctored or altered by Francis.  Doc. 902 at 6.  Defendant Dolan sought to admit Dolan

9  Ex. 451-1, an excerpt of a recording of Francis with Tom Wright, a podcast producer.

10 In that excerpt, Francis stated that in 2012 or 2013, John Beliveau warned Francis

11 about a possible indictment and advised him on how to "evade and clean up all the

12 servers and counterintelligence on it."  Dolan Ex. 451-1.  Defendant Dolan argued that

13 the recording showed that Francis "altered electronic evidence in anticipation" of

14 being arrested.  March 17, 2022 PM Tr. 21:5–7.  The United States argued that the

15 recording related to deletion, not that the emails were "doctored or changed."  March

16 21, 2022 AM Tr. 10:6.  The Court ultimately admitted the recording to impeach

17 GDMA's business records certification signed by Francis.  *Id.* at 15:3–4.

18      There is no evidence that any email presented at trial was doctored or altered by

19 Francis in 2012 or 2013 in anticipation of being arrested.  The only example given by

20 the Defendants is a June 11, 2008 email where Francis "cut and paste" the content of

21 a contemporaneous email sent by Steven Shedd and sent that copied content to internal

22 GDMA personnel.  Lausman Ex. 39.1; Doc. 902 at 6.  But the fact that Francis, in

23 2008, "cut and paste" Shedd's contemporaneous email into another correspondence is

24 not evidence that Francis altered or doctored emails in anticipation of being arrested.

25 Indeed, the email at issue was created more than five years before Francis was arrested

26 and years before Beliveau informed Francis of any impending indictment.  Moreover,

27 trial evidence has included a number of examples where the sender of an email copied

28 content from another email.  *See, e.g.,* Gov. Ex. 40-1 and March 10, 2022 PM Tr.

1    22:19–21 (January 28, 2007 email from Edmund Aruffo to Francis where Aruffo "cut

2    and paste" wine requests from Defendant Newland); Gov. Ex. 41-5 and May 5, 2022

3    AM Tr. 17:21-25 (May 4, 2008 email from Shedd to Defendant Lausman where Shedd

4    "ghost" wrote an email invitation to be sent by Defendant Lausman).  In short, copying

5    content from one email and pasting into another is not evidence of doctoring or altering

6    evidence after the fact.

7    **D.    The Court Has Already Ruled on Authenticity**

8         Prior to the admission of each exhibit, the United States laid a foundation for

9    authenticity.  Likewise, the Court made a determination regarding authenticity prior to

10   admitting each exhibit.  To the extent that the Defendants are claiming defects in

11   authenticity, Doc. 902 at 7–9, the Court has already made a ruling to the contrary.

12        Moreover, the specific claims raised by the Defendants are without merit.  The

13   Defendants claim that Special Agent Cordell DeLaPena was not present when

14   materials turned over by Francis's lawyers – such as the nine hard drives or the scanned

15   binders of financial documents to which Agent DeLaPena testified – was first obtained

16   from GDMA.  Doc. 902 at 7.  That is true.  But Agent DeLaPena never claimed

17   otherwise, and the Defendants point to no testimony where Agent DeLaPena makes a

18   contrary statement.  The claim that there were "[m]isleading assurances" made by the

19   United States in this regard, Doc. 902 at 7, is therefore without any basis.

20        In addition, with respect to the electronic materials handed over by Francis's

21   lawyers, Agent DeLaPena testified extensively as to their authenticity, specifically that

22   he reviewed the metadata of relevant documents, he compared relevant documents to

23   documents contained on the laptop seized from Leonard Francis and the documents

24   were identical, and the documents contained distinctive characteristics, such as

25   specific email addresses and signatures.  While it is true that the United States

26   originally planned to call the investigator who first obtained the electronic materials

27   and delivered them to Francis's lawyers, Doc. 902 at 8, Agent DeLaPena's testimony

28   obviated the need for that witness.  *See United States v. Boyce*, 594 F.2d 1246, 1252

- 13 -

1   (9th Cir. 1979) (rejecting claim that the seizing agent was required for authenticity,

2   since the district court found that there was adequate foundation without such

3   testimony).  Ultimately, the Court admitted such documents over objection and never

4   conditioned admission on the investigator testifying.

5          Moreover, the authenticity of the electronic materials was further corroborated

6   by witnesses who had personal knowledge of those materials.  *See* Federal Rule of

7   Evidence 901(b)(1) (one illustration to establish authenticity is the "[t]estimony of

8   witness with knowledge").  Throughout trial, the witnesses – including Edmund

9   Aruffo, Steven Barney, Jesus Cantu, Edward Zawislak, Jeffrey Rathbun, Alexander

10  Gillett , and Stephen Shedd – have testified about emails they sent or received or other

11  materials where they have personal knowledge.  This personal knowledge operates as

12  yet another layer of authenticity for the materials received from Francis's lawyers.

13         **E.     The United States Disclosed Relevant Impeaching Information for**

14         **Gillett**

15         Pursuant to its obligations under *Brady* and *Giglio*, the United States produced

16  impeaching information for Alex Gillett.  As noted by the Defendants, that material

17  included a letter from a member of the prosecution team to the Australian prosecutor,

18  stating "that given Mr. Gillett's prosecution in Australia and his pledge to be

19  interviewed and cooperate fully with our investigation, we do not regard Mr. Gillett as

20  a potential defendant in the United States."  Doc. 902 at 9–10.  Gillett's attorney was

21  advised explicitly on January 27, 2022, "As we discussed previously, Mr. Gillett has

22  been prosecuted for these crimes in Australia and it is not the intent of the DOJ to

23  prosecute him further for the same conduct."[5]   In other words, the United States would

24  not further prosecute Gillett because he had already been prosecuted in Australia.

25  Gillett's criminal prosecution was not accidental or incidental but was expressly

26  contemplated by the United States – records of the Australian court proceeding

27

28  _____

[5]      This document was produced in discovery as GDMA-JX-GIG-000522.

1    indicate that "in 2016 US authorities referred allegations regarding the offender's

2    misconduct to the Australian Federal Police."[6]

3           In the context of jury instructions, and specifically Ninth Circuit Model

4    Criminal Jury Instruction 4.9 ("Testimony of Witnesses Involving Special

5    Circumstances – Accomplice, Plea"), the United States stated: "The United States does

6    not anticipate presenting testimony from any witness who received immunity. The

7    United States does not object to using the other clauses of the instruction to the extent

8    justified by the evidence at trial."  Doc. 594 at 8.  The Defendants seize on this

9    language and claim that the United States made a false representation regarding

10    immunity, apparently believing that the United States granted Gillett immunity.  Doc.

11    902 at 9.  It did not.  As noted in the very material produced to the Defendants, the

12    United States declined further prosecution given Gillett's prosecution in Australia.

13           In any event, the United States agreed to the remainder of the model instruction,

14    including: "You have heard testimony from [name of witness], a witness who . . .

15    [received [benefits] [compensation] [favored treatment] from the government in

16    connection with this case] . . . ."  The central dispute between the parties is form rather

17    than substance.  Did Gillett receive a benefit in the form of a promise from the United

18    States not to prosecute him if he cooperated and was prosecuted by Australian

19    authorities?  Yes.  Is that benefit properly described as "immunity?"  The parties can

20    agree to disagree.  But the United States unquestionably fulfilled its disclosure

21    obligation with respect to this witness.

22           The Defendants also take issue with a standard admonition given to witnesses:

23    to refrain from writing substantive statements.  Doc. 902 at 10.  Under *Jencks*, such

24    statements would be discoverable and would need to be produced to opposing counsel.

25    It is a common practice to tell witnesses about this rule, who may not be familiar with

26    the nuances of criminal procedure.  And such admonition is consistent with the case

27    law, since the United States has no obligation to create written statements discoverable

28

---

[6]    This document was produced in discovery as GDMA-JX-GIG-000551.03.

under *Jencks*. *United States v. Bernard*, 625 F.2d 854, 859 (9th Cir. 1980). Moreover, in no way is this admonition a direction to suppress *Brady* information. Indeed, if the witness gave exculpatory information orally, that information would need to be disclosed to the Defendants regardless of its form. Bearing this out, after the admonition was given, the United States produced emails written by Gillett requesting special accommodations for his travel to the United States,[7] as well as additional information about Gillett via letter.[8] Discouraging witnesses from using informal means to share substantive case-related information is not misconduct.

### F.     The Court Has Already Ruled on Summary Testimony

During Agent DeLaPena's testimony, the Defendants objected on a number of occasions that the testimony was summary testimony. Though the Defendants have couched the objection in terms of "summary testimony" or "summary witness," that objection is not accurate. Under Ninth Circuit case law, "summary testimony" is testimony where the witness summarizes testimony or evidence that has *previously been admitted* at trial. *United States v. Leon-Reyes*, 177 F.3d 816, 819 n.4 (9th Cir. 1999). Moreover, summary testimony of previously admitted testimony and evidence is permissible in the discretion of the district court under Federal Rule of Evidence 611(a). *United States v. Baker*, 10 F.3d 1374, 1412 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) (collecting cases). The objections here related to Agent DeLaPena's interpretation or characterization of a document's content, which is more accurately viewed as a personal knowledge or foundation objection.

The Court, in its contemporaneous rulings on these objections to Agent DeLaPena's testimony, exercised its gatekeeping function to draw the line between appropriate and inappropriate testimony. In some instances, the Court overruled the

---

[7]     This document was produced in discovery as GDMA-000020.

[8]     This letter was sent to all counsel on April 29, 2022.

1   objection; and in others, the Court sustained the objection.  *Compare, e.g.*, April 11,

2   2022 Tr. 27:2 (sustaining objection) *with id.* at 123:23 (overruling objection).  The

3   Defendants take issue with such testimony, Doc. 902 at 10–11, but the Court has

4   already provided the evidentiary remedy to which they are entitled: sustaining the

5   objections when warranted and disallowing the testimony.

6   **G.     The Court Has Already Ruled on the Use of the Words "Bribe" and**

7   **"Conspiracy" During Trial**

8          As Defendants concede, the Court originally allowed the use of the words

9   "bribe" and "conspiracy" at trial, over the Defendants' objections.  Doc. 902 at 12.

10   Defendant Loveless then filed briefing on the issue, Doc. 780, and the United States

11   responded, noting a number of cases that allowed the use of such terms at trial, Doc.

12   784 at 1–2.  The Court took a measured approach, noting that although it had initially

13   allowed testimony that was more "generalized," the Court signaled it would sustain

14   objections to conclusory testimony.  March 22, 2022 AM Tr. 4:7–15.  And the Court

15   sustained (and overruled) objections accordingly.  *See, e.g.*, *id.* at 96:24 (overruling

16   objection to the use of the word "bribery" in question regarding training).  To the extent

17   that the Defendants objected to the use of these words at trial, Doc. 902 at 13, their

18   recourse was through objection and respective ruling from the Court.  Likewise, to the

19   extent the Defendants objected to words they considered vague, *id.*, the Defendants

20   had that same recourse.  *See, e.g.*, March 22, 2022 AM Tr. 14:11–12 (sustaining

21   objection to the phrase "one of those other people").  As with their other, evidentiary

22   issues, the Defendants' claim here is not misconduct.

23   **H.     The Court Has Already Ruled on the Admission of a Poster**

24          In a supplemental brief, Defendant Loveless argues that the United States

25   attempted to introduce a poster given by members of the conspiracy to Francis, and

26   that such poster would present a false narrative.  Doc. 920 at 12.[9]  That poster was

27   ───────────────

28   [9]     In addition, Defendant Loveless re-raises two other issues: (i) purported
misrepresentations regarding Ynah; and (ii) purported misrepresentations regarding

1   created by Sanchez at the request of Defendant Dolan.  May 16, 2022 Tr. 28: 14–15.

2   The United States made no misrepresentations regarding the poster and agreed with

3   the Defendants that the signatures on the poster were made by Sanchez's then-wife.

4   *Id.* at 31:16–18.  Ultimately, the Court excluded the poster on relevance grounds.  *Id.*

5   at 37:25–38:8.  The exclusion of the poster was the appropriate remedy, not dismissal.

6   It is hard to see how the attempted introduction of a poster is "flagrant misbehavior."

7   *Kearns*, 5 F.3d at 1253.  Likewise, it is hard to see how there was any prejudice to

8   Defendant Loveless, let alone the "substantial prejudice" required for dismissal, *id.*,

9   given that the poster was excluded from evidence and the jury will never learn of it or

10  see it.  Such exclusion was the appropriate "lesser remedial action" and dismissal is

11  therefore inappropriate.  *Bundy*, 968 F.3d at 1031.

### CONCLUSION

13      The Court should deny the motion to dismiss the Indictment.  None of the issues

14  – individually or collectively – arise to "flagrant misbehavior" or have caused

15  "substantial prejudice" to the Defendants.   Instead, the Court has appropriately

16  addressed the vast majority of the issues raised with appropriate lesser remedies.

18  DATED: May 23, 2022                        Respectfully submitted,

20                                             RANDY S. GROSSMAN
                                               United States Attorney

22                                             /s/ David Chu
                                               Assistant United States Attorney

---

26  Sanchez and potential child pornography.  Doc. 920 at 2–10.  Procedurally, this
    briefing ignores the schedule previously set by the Court to address the issues of

27  alleged misconduct and impermissibly attempts to augment the joint filing made in
    accordance with that schedule.  Substantively, Defendant Loveless treads no new

28  ground and the United States submits on its response above.